# EXHIBIT A

*Iron Workers Local Union No. 25*

Phone: (248) 344-9494
Fax #: (248) 344-4851

**2004-2007**
**INTERIM AGREEMENT**
**(STRUCTURAL)**

NAME OF CONTRACTOR    A J Steel Erectors LLC

This Agreement is entered into between the International Association of Bridge, Structural, Ornamental and Reinforcing Iron Workers Local Union #25 and the undersigned employer.

1. Local 25 and the Great Lakes Fabricators & Erectors Association, The Associated General Contractors and the Michigan Conveyor Manufacturers Association, (hereinafter referred to as the Association) are parties to a collective bargaining Agreement with an expiration date of May 31, 2007.

2. Until printed copies of the collective bargaining agreement between Local #25 and the Association are available for distribution, this serves to bind the Contractor to all wages, hours, fringe benefits and other terms and conditions provided for in the Collective Bargaining Agreement referred to in Paragraph #1.

3. The undersigned employer further agrees to be bound by the Agreements and Declarations of Trust and any and all Rules and Regulations applicable thereto, as set forth by the Joint Board of Trustees and/or required by Federal and State Laws governing such Wage Rates and Trust Fund contributions.

**FOR THE EMPLOYER:**

Signed by: _____

Name & Title  Alan E Moyski  Owner

Address  15950  Common Rd.

City, State Zip  Roseville Mi, 48066

Phone #  248-698-9206

MUA#  B3359U

Federal I.D. #  20-1825130

Workers Comp Carrier  Accident Fund

Workers Comp #  WCV 600 80 20

Fax #  248-647-4689

Date:  12-13-04

**FOR THE UNION:**

Signed by Union Representative

Title  Pres. B.A.

Date  12-13-04

# 2007-2010 IRON WORKERS AGREEMENT

between

### GREAT LAKES FABRICATORS AND ERECTORS ASSOCIATION

### THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA MICHIGAN CHAPTER

### MICHIGAN CONVEYOR MANUFACTURERS ASSOCIATION, INC.

and



### LOCAL UNION NO. 25 INTERNATIONAL ASSOCIATION OF BRIDGE, STRUCTURAL, REINFORCING AND ORNAMENTAL IRON WORKERS AFL-CIO

# EXPLANATION OF CONTRACTOR DEDUCTIONS
## FOR VACATION PAY
### FOR STRUCTURAL CONTRACT

To assist you in determining the proper manner in which Vacation Pay is computed and deducted from each Employee's pay check, as per Article 17 of the Contract, the following example is offered as a guide:

John Doe worked 40 (forty) hours at $27.81 per hour, which would amount to $1,157.20.

Thus: Gross Earnings .............................................. $1,157.20

Vacation Pay at 17.39% of Gross Earnings ................ +201.20

These two items are added in order that the
Vacation Pay might be taxed .................................. $1,358.40

Assuming that FICA is $75.34 and Medicare is $17.62 and
Federal Income Tax is $246.00 and State Income Tax is
$51.04, thus the combined total of taxes is $390.00.
Therefore, $390.00 must be deducted for tax purposes ...... −390.00

Now that taxes have been paid on the combined hourly
earnings and the Vacation Pay, you must subtract the
amount of Vacation Pay in order to send it in to the
Vacation Fund ........................................................ −183.21

Net Amount of Pay Check ...................................... $ 767.20

Forms for funding contributions may be obtained from the Iron Workers' Local No. 25, Fringe Benefit Fund Office, P.O. Box 8006, Novi, Michigan 48376-8006. Telephone: (248) 347-3100.

(The amounts for the taxes being deducted are fictitious for this example. Please be sure to use your tax tables when calculating the actual amount of taxes.)

# INDEX TO AGREEMENT

| | Page |
|---|---|
| Adoption Agreement | 38 |
| Agreement | 1 |
| Beverage Breaks | 11 |
| Business Representative | 32 |
| Code of Excellence | 40 |
| Craft Jurisdiction | 1 |
| Credit Union Deductions | 3 |
| Drinking Water, Clothes Room | 9 |
| Drug and Alcohol Testing Program and Safety Program | 29 |
| Employer Certification | 8 |
| Equal Treatment Clause | 35 |
| Excess Benefit Fund | 21 |
| Fire Watch | 37 |
| Foreman and General Foreman | 31 |
| Fringe Benefit Funds | 20 |
| Health Fund | 20 |
| IMPACT Fund | 21 |
| Industry Promotion and Improvement Fund | 25 |
| Iron Workers Door Work | 14 |
| Iron Workers Conveyor Work | 7 |
| Iron Workers Required on Guy and Stiff Leg Derricks | 31 |
| Job Steward | 32 |
| Jurisdiction of Work | 1 |
| Labor Management Committee | 29 |
| Market Recovery Agreement | 32 |
| Memorandum of Understanding | 39 |
| Odd Shifts | 6 |
| Optional Work Week | 29 |
| Overtime and Holidays | 11 |
| Parking | 11 |
| Pay Day | 17 |
| Pension Fund | 20 |
| Preamble | 1 |
| Pre-Job Conference | 11 |
| Protection of Union Principles | 33 |

## INDEX TO AGREEMENT (cont'd)

| | Page |
|---|---|
| Renewal Clause | 36 |
| Safety | 8 |
| Savings Clause | 36 |
| Scope of Agreement | 35 |
| Settlement of Disputes: Joint Grievance Board | 34 |
| Shift Work | 6 |
| Shipping Employees Out of Local Jurisdiction | 17 |
| Show-Up Time | 30 |
| Strikes and Lockouts | 35 |
| Subcontractors | 33 |
| Successor Clause | 36 |
| Surety Bonds/Security Deposit | 17 |
| Territorial Jurisdictional Area | 3 |
| Tools | 9 |
| Training Fund | 20/26 |
| Union Security | 2 |
| Vacation Pay Fund | 20 |
| Wage and Fringe Package | 12 |
| Welding | 11 |
| Work Assignment | 10 |
| Work Hours Per Day | 3 |
| Work Limitations Restrictions | 10 |
| Working Conditions | 8 |

# CHARTER GRANT
## Jurisdiction of Work

Section 1. The jurisdiction of the Second Party covers for its members the following work: the fabrication, erection and construction of all iron and steel, lead, bronze, brass, copper, aluminum, and plastics or other materials when used in place thereof, reinforced concrete structures or parts thereof; bridges, viaducts, inclines, dams, docks, dredges, vessels, locks, gate, aqueducts, reservoirs, spillways, flumes, caissons, cofferdams, subways, tunnels, tramways, monorails, windmills, jetways, blast furnaces, precipitators, stoves, kilns, dryers, coolers, crushers, agitators, pulverizers, mixers, roasters, concentrators, ovens, cupolas, smoke conveyors, pen stocks, flag poles, drums, shafting, all storage racks, bins, and pans, ventilators including air ducts in connection therewith; curtain wall, facia and any related materials that retain glass. Stacks, stage equipment, counter weight systems, rigging for asbestos curtains, bunkers, conveyors, speed walks and similar equipment, dumpers, elevators, vats, enamel tanks and vats, towers, tanks, hoppers, bins, plates, anchors and anchor bolts, caps, corbels, lintels, Howe and combination trusses, grillage and foundation work, bucks, partitions, hanging ceilings, hangers, clips, brackets, flooring, floor construction, steel floor decking and domes, cast tiling, frames, air ducts dust and trench frames and trench frame angles and angles for machinery bases, shelf angles for support of brick, stone or any other material, all iron in expansion joints and plates including baffle, blast, deflector, smoke, bearing and slice plates, plates in vaults, structural supports for conveyor wheel or corner guards, grill work, skylights, roofs, canopies, marquees, awnings, elevator and dumb waiter enclosures, elevator cars, trucks, fascias, aprons, frames, fronts, racks, book stacks, tables, chutes, escalators, ventilators, doors, signs, jail and cell work, vaults, vault doors, plenums, corrugated sheets when attached to steel frames, frames in support of boilers; material altered in framing, cutting, bending, drilling, burning and welding including acetylene gas and electric machines; metal forms and false work; electrical metallic tubing and installation of all articles made of wire and fibrous tubes, traveling sheaves, vertical hydraulic elevating, and skip hoists; the making and installation of all fence on construction sites, false work, fibrous rope, chain link fence, all fence on construction sites, false work, travelers, scaffolding, pile drivers, sheet piling, derricks, cranes; the erection, installation, handling and operating of same on all forms of construction work; all railroad bridge work including their maintenance, removal wrecking and dismantling of all of the above and all housesmith work and submarine diving in connection with or about same. The erection of steel towers, chutes and spouts for concrete where attached to towers, the handling and fastening of the cables and guys for same. The racking, sorting, cutting, bending, hoisting, placing and tying of all iron, steel and metal used in reinforced concrete construction, including mesh for floor anchors, the making of hoops and stirrups, metal forms and metal supports thereto, including steel foundations, beams, rails in buildings, viaducts, all sectional and other steel stacks erected in office buildings, hospitals and hotels, all stacks erected in small power plants in connection with office buildings, hospitals and hotels. All extensions and repairs to such stacks on buildings herein mentioned. Coal bunkers, bins or hoppers bolted, welded or riveted whether used for coal, grain, ore, stone or any material. Hanging ceilings, angles, tees, channels, beams, etc. Structural iron and steel work

1

for support of boilers, hoppers. Elevators; also jacking up all elevated roads and bridges. Wrecking of bridges, viaducts, elevated roads and structural steel and iron work on buildings. The erection and removal of all false-work, kettle bearings, rocker bearings, pot belly and bridge bearings from all types of bridges, products and elevated roads, all cast iron and steel mullions of any kind in store fronts. All frames for openings except where iron or kalamein doors are hung; all porches, verandas and balconies, all mullions of cast iron, all support for ventilators, all skylights and penthouses, except canopies. All framework cast work or operating devices. All structural work to shell ornamental cast work or operating devices. All work on cells in jails and police stations, including the setting and fitting of doors; all elevator pockets; all overhead travelers, I beams or channels, monorails and tramways, dumb-rails, tram-rails, caps, lintels and anchor bolts. Structural steel and iron work for sidewalks including curb angles, plates, reinforcing steel and wire mesh. The framing and erection of structural steel work for signs, elevators, chutes, skip hoists, blast furnaces, precipitators, angles for machinery bases, shelf angles for support of brick, stone or any other material and all iron in expansion joints. Erection of structural steel work for bulkheads or sluice gate work in connection with pumping stations, on dams, and locks. All necessary changes pertaining to this classification of work, such as drilling, chipping, bending, etc.; cutting and welding with gas and electricity. Erection, setting, repairing, lining and anchoring of machinery and mechanical devices in bridges, blast furnace top mechanism, car dumpers and hoists, cranes, derricks, pug mill machinery, ore buckets, ore unloaders and conveyors (excepting machinery classified as electrical), erection, setting, repairing, lining and anchoring of guard or collision rails and on bridges and approaches, the erection and dismantling of structural steel and tubular towers, structures such as bleachers, stands and scaffolding, including structural steel and columns for temporary barricades around buildings under construction; all the unloading of material when done by derrick, tackle, or outrigger; the laying, tying, setting, fabricating and bending, (when done on the job) of all steel or iron rods; wire mesh work or other metal used in reinforcing concrete and floor construction, including paper back wire mesh and corrugated sheeting used in floor construction. Reinforced columns shall be made in full on the job. The hoisting of all such material when a derrick or outrigger is used, the setting of all pre-molded, reinforced concrete slabs. The handling and setting of all types of structural steel frame construction including metal joists. The erection of steel houses and all types of metal joists, including metal boxes for Trussbilt and performed Keystone shaped metal joists. The erection of steel houses and prefabricated buildings. A journeyman shall be employed for the maintenance of reinforcing steel while concrete is being poured on reinforcing steel, including wire mesh.

The installation of all ferrous, non-ferrous and/or protected metal corrugated sheeting 5" or less, between centers of corrugation all translucent and plastic material on steel frame construction shall be the work of the Iron Worker.

The erection of structural steel frames and supports, in connection with skylights, ventilators, ovens, spray booths, annealing booths, dust collecting systems, blow pipe systems, fume exhaust systems, cyclones, dryers, conveyors, chutes, hoppers and enclosures shall be the work of the Iron Workers.

Technology changes are constantly occurring in the manufacturing processes of producing building components which modify the composition (or gauge) of the materials used to achieve the final products,

but are still designed and manufactured to function the same as products which are traditionally manufactured products in carbon steel, high-strength steel, aluminum, bronze, or stainless steel. Where the professional design engineers may substitute a high strength carbon fiber or steel fiber injected into reinforced polymer composites to replace an all-metallic product, the carbon or steel fibers provide the strength for the polymer composite product to perform, precisely the same as the load bearing steel product. In every case, whenever a pultruded or cast-fiber-reinforced product, aramid, epoxy, polyester, or other fiber-reinforced plastic product is replacing or substituting, or working in conjunction with traditional metal sections, products, or structural shapes, the work of erecting or installing the modified product is the work of the Iron Worker, without any exceptions.

# AGREEMENT

This Agreement is made on June 1, 2007, between the Associated General Contractors of America, Michigan Chapter, the Great Lakes Fabricators and Erectors Association, and the Michigan Conveyor Manufacturers Association, Inc., (collectively referred to as the Association), representing its members (Employer or Employees), and Local Union No. 25 of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers (affiliated with the AFL-CIO), (Union), representing its members (Employer or Employees).

## ARTICLE 1

### PREAMBLE

This Agreement is entered into by collective bargaining to prevent strikes and lockouts and to facilitate peaceful adjustment of grievances and disputes between Employer and Union in this trade and to prevent waste, unnecessary and avoidable delays, and expense, and, so far as possible, to provide for labor's continuous employment, such employment to be in accordance with the conditions and at wages agreed upon; also, that stable conditions may prevail in the building industry and building costs may be as low as possible, consistent with fair wages and conditions and further, the establishment of the necessary procedures by which these ends may be accomplished.

## ARTICLE 2

### CRAFT JURISDICTION

A. This Agreement covers all field erection and construction work traditionally performed by and coming under the jurisdiction of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers (Iron Workers). The Employer recognizes that the claimed scope of work covered under this Agreement by the Iron Workers is that provided for but not limited to the jurisdictional claims contained within the charter grant issued by the AFL to the Iron Workers and contained in Article 4 of the Iron Workers' Constitution.

B. Agreements national in scope between Iron Workers and other International Unions covering work jurisdiction and allocation and division of work among Employees represented for the purpose of collective bargaining by such labor organizations, shall be respected and applied by the Employer.

C. Disputes:

1. It is understood and agreed that Employers signatory to this Agreement shall not sign a stipulation to be bound by the terms of the agreement establishing the Impartial Jurisdictional Disputes Board nor be bound by its decisions. Any such stipulation that previously may have been entered into on or on behalf of the Employer, is rescinded by execution of this contract. It is further understood that the parties to this Agreement shall not submit any dispute to the Impartial Jurisdictional Disputes Board.

2. Article 2, Paragraph C. 1. shall remain in full force and effect until such time as all other Employees in the construction industry having agreements with the Iron Workers Union,

1

and all other unions affiliated with the Building and Construction Trades Department, have signed a stipulation to be bound by the terms of the agreement and decisions of the Imperial Jurisdictional Disputes Board.

3. In the event of any dispute as to jurisdiction of work covered by the terms of this Agreement being claimed by unions other than those affiliated with the Building and Construction Trades Department, AFL-CIO, then such dispute shall be referred to the International Unions involved, for determination by whatever procedures they may adopt and the work shall proceed as assigned by the individual Employer until such determination by the International Unions in any given jurisdictional determination shall be implemented immediately by the individual Employer involved.

There shall be no strikes, work stoppages, or other interferences with the work by reason of jurisdictional disputes.

D. The Union agrees to furnish competent workmen to perform the work established within its jurisdiction.

E. The parties to this Agreement agree that when necessary to assemble or disassemble hoisting equipment to be used exclusively on hoisting or erecting steel, equipment and material coming under Iron Workers' jurisdiction, such assembly shall be the work of the Iron Worker to assemble or disassemble the cranes if they have been or are to be used by some other craft. It is also agreed that the assembly, disassembly, erection and maintaining of Guy Derricks, Stiff Leg Derricks and Chicago Booms used for hoisting steel, material and equipment shall be done by Iron Workers.

F. The parties to this Agreement agree that the plumbing, aligning and leveling of all structural steel on bridges and buildings through the use of optical instruments, laser beams, etc., shall be the work of the Iron Worker. This shall not preclude the use of supervisory or administrative personnel to direct the Iron Worker performing these operations by utilizing such instruments in the direction of the work of the Iron Workers.

G. Where structural steel, on buildings, bridges and other structures is dismantled and demolished and power equipment (derricks, cranes, rigging, etc.), is used in the dismantling of structural steel, the handling and loading of same shall be performed by the Iron Workers.

H. The Employees agree that before any job starts, that they will send letters of assignment to the Union, wherever possible.

## ARTICLE 3

### UNION SECURITY

All Employees who are members of the International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers on the effective date of this Agreement shall be required to remain members of the Union in good standing as a condition of employment during the term of this Agreement. All Employees may be required to become and remain members of the Union in good standing as a condition of employment after the seventh day following the dates of their employment, or the effective date of this Agreement, whichever is later.

## ARTICLE 4

### CREDIT UNION DEDUCTIONS

During the life of this Agreement, Employer agrees to deduct, at the option of the Employee, a uniform deduction in the amount of 5% or 10% of the gross earnings, exclusive of Health & Welfare, Pension, Vacation and Holiday Pay, Training Fund and Travel Expense from the weekly pay of each Employee who executes or has executed "Authorization for Deduction Forms" as provided for by "Iron Workers Local No. 25 Credit Union." Monies deducted shall be directed to the office of the Credit Union on report forms so provided not later than the 10th of the month following the month for which deductions were made.

Once an Employee has signed up for credit union deductions, he must remain in the program for the duration of the calendar year for each Employer until he is signed up for, unless the Employee submits a request in writing to be dropped. Such request must be submitted to each Employer a minimum of four (4) weeks prior to the credit union deduction being terminated. All monies deducted can only be collected from the Credit Union.

## ARTICLE 5

### TERRITORIAL JURISDICTIONAL AREA

The territory covered by this Agreement shall be the territorial jurisdiction of Local Union No. 25, consisting of the following counties in Michigan (34 counties):

Jackson, Clinton, Gratiot, Isabella, Ingham, Crawford, Otsego, Cheboygan, Montmorency, Alpena, Presque Isle, Oscoda, Alcona, Ogemaw, Iosco, Gladwin, Arenac, Bay, Midland, Shiawassee, Livingston, Washtenaw, Wayne, Oakland, Lapeer, Genesee, Tuscola, Sanilac, Huron, Saginaw, Macomb, Clare, St. Clair and Roscommon.

## ARTICLE 6

### WORK HOURS PER DAY

A. Eight (8) hours shall constitute a day's work, from 8:00 a.m. to 4:30 p.m., from Monday through Friday; however, the starting time between May 1 and October 1 may be adjusted to 7:00 a.m. with notification to the Business Manager prior to the start of the job. Where composite crews are working the Employer must receive prior approval of the Business Manager.

B. Changes in the work hours per day in special cases, not however to exceed an eight (8) hour day, may be made to meet special conditions upon application and approval of the Business Manager.

C. The lunch period shall start four (4) hours after the start of the regular shift. When men are requested to work through their regular established lunch period, double the prevailing rate of wages shall be paid for that period of time.

D. If men are required to work more than ten (10) hours (physical hours worked), a paid lunch period of one-half (½) hour shall be provided after ten (10) physical hours worked. The same shall apply after every four (4) hours physically worked thereafter. If the Employee works through his additional lunch period or periods he shall receive four (4) times the straight time shift rate for each lunch period worked. The Employees shall

not be required to work through his additional lunch period or periods, except for start up or standby. Employer may be adjusted for all or a portion of the time the Employer requires the start up or standby activities. Such adjustment meant to be thirty (30) minutes earlier or later than the regular lunch period. This adjustment will be without premium and does not modify the true shift hour.

E. Work performed before the start time or after an eight (8) hour period, Monday through Friday, shall be paid at time and one-half (1½) the regular straight time rate of pay after eight (8) hours and double time after ten (10) hours. Time and one-half (1½) for the first ten (10) hours on Saturday and double time thereafter. Double time for all work on Sunday or a recognized holiday shall be paid.

F. Any undue delay or loss of time caused by the Contractor to the Employee shall be paid for by the Employer causing such delay at the regular established rate of wages for the rest of the shift except in the event of civil disturbance or a condition beyond the control of the Employer.

Where an Employer contacts the Union Hall prior to 11:00 a.m. and requests Employees to report to work the following day, the Employee is expected to start work the following day at 8:00 a.m. No consideration shall be given to the Employee for time to travel to the job. If the Employee picks up the work order the next day he will be paid for a reasonable amount of time to get to the job.

Where an Employer contacts the Union Hall and requests Employees to report to work the same day, the Employer agrees to pay for a reasonable amount of time it takes the Employee to travel from the Union Hall by the most direct route to the job site.

This Article shall not be associated with or misconstrued with the show up provisions of this Agreement or the lay-off provisions.

## ARTICLE 7

## PAY DAY

A. The regular pay day shall be once a week on such day as agreed upon between the Employer and the Union and wages shall be paid during regular working hours, excluding lunch period and wages are to be paid in cash or payroll checks.

B. Employers may withhold where necessary a reasonable amount of wages due to enable them to prepare the payroll. Such reasonable amount shall in no event exceed four (4) days' wages. In the event pay day falls on a Holiday, the Employee shall be paid on the day before the Holiday.

If the men are not paid on the day before the Holiday, the men shall be paid for the Holiday at straight time. The above does not apply in the event of civil disturbance, or if the job is scheduled to work on the said Holiday.

C. On the regular established pay day as agreed to by the Union and the Employer, checks must be available at the job site prior to the end of the shift. On an inclement day any Employee who had reported to the job site for his pay check prior to an elapsed time of two (2) hours of the start of the shift and the check is not available, would receive the waiting time at the regular straight time rate of wages not to exceed the end of the normal working day. Where an Employer does not provide the weekly pay

4

checks timely, the Employer shall pay an eight (8) hour penalty. Employees must stay on the job until the end of the shift when instructed by the Employer. The eight (8) hour penalty is not applicable where the failure to provide the paychecks was beyond the control of the Employer. The above does not apply in the event of civil disturbances.

D. When Employees are laid off or discharged, they shall be paid in full in cash or payroll check on the job immediately and if required to go to some other point or to the office of the Employer, the Employee shall be paid double the straight time rate of wages for the time required to go to such places, unless ample time is given the Employee to go to such places designated by the Employer to pick up the check prior to the end of the shift.

E. When Employees quit of their own accord, they shall wait until the regular pay day for the wages due to them.

F. When Employees are laid off, Contractors in good standing may pay off the Employee by mailing his final check, without penalty, by the next business day in the event layoff occurs at odd hours or weekends.

In the event the checks are not postmarked the next business day the following premiums shall apply:

1. For the next 24 hour period, an additional premium of two (2) hours shall be added.

2. After the next 24 hour period, an additional premium of six (6) hours shall apply.

3. After the next 48 hour period, an additional premium of six (6) hours per work day shall apply.

G. Accompanying each payment of wages shall be a separate statement identifying the Employer, showing the total earnings, the amount of each deduction including vacation pay, city tax, state tax, federal tax, and F.I.C.A., and Credit Union. Payroll checks shall be considered as legal tender for purposes of this Article. Personal checks will not be accepted.

H. In the event that the bank upon which the Employer draws his payroll check refuses to honor the payroll check, regardless of where the payroll check was originally cashed, the Employer must within twenty-four (24) hours thereafter issue to the Employee in question, payment in cash, money order, or certified check in the gross amount of said dishonored payroll check, plus twenty percent (20%) of the gross amount.

I. In the event a payroll check is not honored at the bank due to insufficient funds, the Employer will thereafter pay in cash or certified check, if requested to do so by the Union. Under this paragraph, certified checks or cash must be accompanied by a statement showing all deductions made and amounts to be paid to each of the Fringe Benefit Funds.

J. In the event the Employer does not have its principal place of business in the State of Michigan, the Employer shall be required to maintain a payroll and fringe benefit account at a commercial bank located within the county in which the job site is located. Such account shall be used to pay all monetary obligations arising pursuant to the Collective Bargaining Agreement.

K. When Employees are laid off whether through a reduction in the work force or job completion, the Employee shall be given a lay-off slip.

5

## SHIFT WORK

A. When multiple shifts are worked and the first shift starts at a time other than during the regular working day as defined in Article 6, the overtime rate for shift work will be paid for at premium time, as defined in Article 6, Paragraph E. After 8:00 a.m. the following day, when two (2) shifts are employed, each shift shall work seven and one-half (7½) hours for eight (8) hours' pay at regular time; and any additional time worked shall be at premium time, as defined in Article 6, Paragraph E. After 8:00 a.m. the following day when three (3) shifts are employed, seven (7) hours shall constitute a day's work for which a regular wage of eight (8) hours shall be paid or a proportionate part thereof for time worked. When multiple shifts are worked on Sunday or recognized holidays, the following shall apply; when two (2) shifts are employed, each shift shall work seven and one-half (7½) hours for eight (8) hours' pay at double the straight time rate of wages. When three (3) shifts are employed, each shift shall work seven (7) hours for eight (8) hours' pay at double the straight time rate or a proportionate part thereof for time worked. On all shift work performed on Sunday or holidays, the overtime rate of double time shall start with the beginning of the first or "morning" shift. In localities where the work is less than eight (8) hours per day, the hours on shift work shall be shortened proportionately.

B. All overtime shall be paid pursuant to Article 6, Paragraph E, of this Agreement. No Employee will be required to work more than eight (8) hours for straight time on any shift for the Employer during a twenty-four (24) hour period from 8:00 a.m. to 8:00 a.m.

When Employees are required to work more than sixteen (16) hours in any one day, including lunch hours, they shall not be required to go on straight time without getting eight (8) hours off the job. When Employees are required to carry on into the next workday while working on another shift they shall be paid at premium time, as defined in Article 6, Paragraph E.

C. Any additional men required to work on any shift will receive the same rate of pay as the men already at work on that shift providing they have not worked on any other job for the same Employer on that day.

D. Any shift worked under this provision shall be for a minimum of eight (8) hours pay. If the first hour of the shift is paid for at premium time, as defined in Article 6, Paragraph E, the same shall apply to each shift thereafter.

# ARTICLE 9

## ODD SHIFTS

A. The following conditions shall apply only to work that interferes with normal production during regular working hours of customer's productivity.

B. Rates

June 1, 2007

Journeyman................. $29.43
Foreman................... 30.43
Acting General Foreman........ 30.68
General Foreman............ 30.93

The odd shift rate shall be fifty cents ($.50) over the journeyman and apprentice rates.

C. Any shift worked under this provision shall be for a minimum of eight (8) hours pay.

D. Any additional men required to work on any shift will receive the same rate of pay as the men already at work on that shift providing they have not worked on any other job for the same Employer on that date.

Odd shift rates will be increased on June 1, 2008 and June 1, 2009 in accordance with Article 13.

# ARTICLE 10

## IRON WORKERS CONVEYOR WORK

A. The Employer may employ other than one shift of Iron Workers when working on conveyors. Night shift work will be any hours starting at or after 4:30 p.m. to 8:00 a.m. When there are two (2) shifts working, each shift will work eight (8) hours. When there is a single night shift starting after 4:30 p.m. without a day shift working, the shift shall work eight (8) hours at the rate established for the second and third shifts. When three (3) shifts are working, the first shift shall work eight (8) hours and the second and third shifts shall work seven (7) hours each. Any shift work starting after 4:30 p.m. will receive the rate of wages in accordance with Article 10, Paragraph B.

B. Shift work between the hours of 8:00 a.m. Monday and 8:00 a.m. Saturday shall be calculated as follows for the second and third shifts:

Base wage rate multiplied by eight (8) divided by seven (7) plus twenty-five cents ($.25) per hour plus applicable fringes.

Other classifications and conditions to be paid as set forth in Article 13.

C. The overtime rate for shift work will be paid for at premium time rates as defined in Article 6, Paragraph E, except that a night shift may not be started at straight time rate after 4:30 p.m. Friday without a day shift having worked that Friday.

No Employee will be required to work more than eight (8) hours for straight time on any shift for the Employer during a twenty-four (24) hour period from 8:00 a.m. to 8:00 a.m. When Employees are required to work more than sixteen (16) hours in any one day, including lunch hours, they shall not be required to go on straight time without getting eight (8) hours off the job. When Employees are required to carry on into the next work day while working on another shift they shall be paid for at premium time, as defined in Article 6, Paragraph E.

D. Any additional men required to work on any shift will receive the same rate of pay as the men already at work on that shift providing they have not worked on any other job for any other Employer on that date.

E. When two Foremen are employed, supervising crews of men one shall be classed as Acting General Foreman. When there are three Foremen or more, the General Foreman shall work in a supervisory capacity over the Foreman. The guaranteed 40 shall not apply to foremen employed on conveyor jobs.

The following rates shall apply:

(Total package not to exceed Millwright's rate after Fringe Distribution)

| | |
|---|---|
| Foreman | $1.50 per hour over scale |
| Acting General Foreman | $2.00 per hour over scale |
| General Foreman | $2.50 per hour over scale |

F. When the Employee is ordered by the Employer or his representative to report for work, then through no fault of the Employee he is not put to work, the Employee will be guaranteed a minimum of four (4) hours reporting time at the prevailing rate for that day, weather permitting.

G. If job circumstances require Employees to work more than ten (10) hours on any shift, they shall have a second lunch period of one-half (½) hour after ten (10) hours of physical work and every four (4) hours worked thereafter which shall be paid for by the Employer. If the Employee works through his additional lunch period or periods, he shall receive four (4) times the straight time rate for each lunch period worked. During certain production start-ups and stand-by conditions, the Employer may adjust the regular lunch period for all or for a portion of the work force on any shift to support the start-up or stand-by activities. Such adjustment can be up to one-half (½) hour earlier or later than the regular lunch period and will be without premium or modification of shift hours.

H. SUBSISTENCE ALLOWANCE is to be paid from any one of the following five (5) shipping points: Detroit, Flint, Jackson, Saginaw and Lansing (from city hall). The shipping points shall be the city nearest to the Employee's permanent home. Subsistence allowance is only paid providing the Employee reports to work.

Payment will be as follows:

| | |
|---|---|
| 28 miles to 65 miles | $3.50 per day |
| 65 miles or more | $7.00 per day |

I. It is understood that this Article 10 applies only to conveyor work. Article 10 is not a separate contract but is part of this Agreement.

## ARTICLE 11

## WORKING CONDITIONS

A. **Employer Certification**

The Employer agrees to furnish the Union, at its offices, with a current Certificate of Insurance indicating the Employer's Workers' Compensation coverage for the State of Michigan. Such certificates shall contain a ten (10) day cancellation notification clause. The Employer shall also furnish the Union, at its offices, with the Employer's Michigan Employment Security Commission identification number. This provision shall not be construed to impose any duty upon the Union.

B. **Safety**

1. The Employer agrees to maintain all equipment in a safe working condition. The Employer agrees to make all reasonable provisions for the health and safety of its Employees at all times during the hours of employment, and all Employees shall use safety equipment provided by the Employer.

2. No Employee shall be obligated by the terms of this Agreement to use any equipment or vehicle not in safe operating condition and not equipped with all safety appliances required by law.

3. No Employee shall be required to work, nor shall any employee be discriminated against for refusing to work with equipment that is unsafe, or under conditions that are determined unsafe. The provisions of the Michigan Occupational Safety and Health Act (1975) and the continuing safety standards of the Construction Safety Commission, now known as the Construction Safety Standards Commission, are incorporated by reference into this Agreement and will be complied with by the parties to this Agreement. Nothing herein shall be construed and impose any duty on the Union without efforts to ensure safe working conditions are pursuant to Michigan Compiled Laws Annotated 418.827(8).

4. Medical Authorization Forms - When it becomes necessary for an Employee to receive medical treatment or first aid due to a job incurred injury, the Employer must provide the Employee with an Authorization Form showing the Employer's full name and signed by a responsible person designated by the Employer to be presented to the doctor or clinic with a copy to be retained by the Employee.

5. It shall be the obligation of the Employer to notify the Union in ample time prior to Helicopter Lifts in order to determine a safe procedure of operation in compliance with applicable safety and health standards.

C. **Tools**

1. Employees shall be allowed adequate time to pick up Employer's tools, their own tools and change clothes on all jobs and all shifts. Wash up time shall be allowed where abnormally dirty conditions exist. The Union agrees that this condition shall not be abused.

2. Employees shall furnish, for their own use, all necessary hand tools to enable them to effectively install their work. Tools broken on the job shall be replaced by the Employer.

3. The Employer shall not rent or use the equipment owned by an Employee or any member of the Employee's immediate family, other than necessary hand tools. All mobile, copy and tool boxes and cranes furnished by the Employer shall carry the Employer's name in letters at least two inches high and clearly legible to the public.

D. **Drinking Water, Clothes Room**

1. The Employer shall furnish suitable drinking water at all times. On each job of sufficient size and duration a shed or room for the Employees to change their clothes and keep their tools shall be provided. Maintenance of drinking water and shanties shall be performed by the Iron Workers or Iron Worker Apprentices if needed. The shed room will be suitable to the conditions and to the size of the crew.

2. The Employer agrees to reimburse his Employees for loss by fire of clothing and tools when stored at a place designated by the Employer. The amount of such reimbursement shall be subject to adjustment between the Employer and the Union. On all jobs that require an Employee to furnish personal hand tools to perform said work, the Contractor agrees to provide a safe place for Employees to lock up such personal hand tools and further agrees to provide insurance for same in case of fire or burglary. Insurance coverage shall apply to losses in excess of Twenty-Five Dollars ($25.00) but not more than Five Hundred Dollars ($500.00). Proof of loss must include a police report by the Employee. Insurance coverage will apply only when Employee has filed an inventory of his tools prior to loss.

## E. Work Limitations Restrictions

1. Employees shall not contract, subcontract, work, piecework, nor work for less than the scale of wages established in this Agreement. Employers agree not to offer nor to pay, and the Employees shall not accept, a bonus based on specific performance on any individual job.

2. There shall be no restriction as to the use of machinery and tools during regular established working hours.

3. There shall be no restrictions as to the use of any raw or manufactured material, except prison made or as outlined in Article 11.

4. No person shall have the right to interfere with workmen during the working hours.

## F. Work Assignment

1. Any Employer covered by this Agreement who is assigned to any job and fails to live up to this Agreement, or is unfit, or refuses to go to work on his own account, shall be held responsible to the Union and the Employer shall be reimbursed for actual expenses by the Union.

2. The Employer agrees to employ Journeymen or Apprentice Iron Workers to perform the work covered by this Agreement, provided, however, in the event that Journeymen or Apprentice Iron Workers are not available for employment, the Employer may, after notice to the Union, hire a temporary Employee who may remain employed until a reduction in force or lay-off, at which time temporary Employees will be first to be laid-off.

3. The desirability of giving employment to workers 55 years of age and older is recognized by the parties to this Agreement.

4. In the event some men in a crew do not report for work, the balance of the crew on the job shall work until the man, or men, report or are replaced, providing other Iron Workers on the job are not available to fill the crew, and providing the shortage has been reported in to Local No. 25.

## G. Pre-Job Conference

It is agreed there will be a Pre-Job Conference on any job of an estimated cost of One Million Dollars ($1,000,000.00) or more prime contract. This Pre-Job Conference shall be at the option of the Union or Employer.

## H. Beverage Breaks

The Employer shall be allowed to have a non-alcoholic beverage at his work area, once in the first half of this shift and once in the second half. Each break shall not exceed ten (10) minutes in length.

## I. Welding

1. The handling and operation of all acetylene, gas, electric or other types of machinery used for cutting or welding in connection with work covered by Article 11 of this Agreement shall be performed by Employees covered by the Agreement.

2. All welding shall be done by Employees having passed the local test. When tests are required as a condition of employment, the tests shall be given on company time and paid for at the prevailing rate.

3. The Employer shall furnish the welder with a copy of the certification papers if he remains on the job to its completion or for thirty (30) days, whichever occurs first.

## ARTICLE 12

## OVERTIME AND HOLIDAYS

Time and one half (1½) shall be paid for the first two (2) hours of premium time (whether before the regular starting times as defined in Article 6, Paragraph A, or after the shift) on any regular workday, Monday through Friday. Hours worked in excess of ten (10) hours, Monday through Friday shall be paid at the rate of double time. The first ten (10) hours worked on Saturday shall be paid at time and one half (1½). Hours worked in excess of ten (10) hours on a Saturday and all hours worked on Sundays and Holidays shall be paid at double time. No work shall be performed on Labor Day except to save life and property.

The following holidays shall be observed:

New Year's Day

Memorial Day

Independence Day

Labor Day

Presidential Election

Thanksgiving Day

Christmas Day

Any holiday which occurs on a Sunday shall be observed on the following Monday. If a holiday falls during the regular work week, the job may work four (4) ten (10) hour days at straight time at the Employer's option. This provision for four (4) tens only applies to jobs that work a maximum of four (4) tens or less on Monday through Friday only during the Holiday week.

# ARTICLE 13

## WAGE AND FRINGE PACKAGE

The following notes apply to the various schedules as indicated.

Note 1: (T) Indicates Taxable

Note 2: For Structural, Conveyor, Decking, Structural Fence and Protected Door jobs, contributions to Vacation, Health & Welfare, Pension and Training School are based on the percentage of gross pay (including overtime).

Note 3: For Structural, Conveyor, Structural Fence, Protected Door Jobs and Unprotected Door Jobs contributions to Training, Industry Promotion, Drug Testing and Safety and IMPACT are based on hours worked.

Note 4: For Unprotected Door Jobs for Journeymen, contributions to Vacation, Health and Welfare, Pension and Training School are based on a percentage of gross pay (including overtime).

For Unprotected Door Jobs for Apprentices, contributions to Vacation and Pension are based on a percentage of gross pay (including overtime) and contributions to Health and Welfare are based on hours paid (e.g. 2 hours at time-and-one half equals 3 hours paid).

Note 5: Any Employer who is not contractually obligated to contribute to the Industry Promotion Fund, and who elects not to contribute to the Industry Promotion Fund, is obligated to contribute an additional $.20 per hour to the Training Fund (for a total of $.57 per hour).

Note 6: Where fringe fund contributions are indicated by a percentage, the rate has been rounded in the Agreement for illustration purposes. Actual fringe benefit contributions are to be made in accordance with the approved forms.

## RATE INCREASES

Effective June 1, 2008 ....... $1.50

Effective June 1, 2009 ....... $1.50

Iron Workers Local No. 25 shall allocate the distributions of the June 1, 2008 and June 1, 2009 increases by April 30 of that year.

The Union will allocate the June 1, 2008 and June 1, 2009 rate increases, provided that no less than the amount projected as necessary by the Pension Fund Trustees will be allocated to the Pension Fund.

Effective June 1, 2007 through May 31, 2008 the following rates shall apply to the classifications as indicated:

### STRUCTURAL ORNAMENTAL WELDER ERECTORS — Effective June 1, 2007

|  | JOURNEYMAN | FOREMAN | ACTING GENERAL FOREMAN | GENERAL FOREMAN |
|---|---|---|---|---|
| (T) Base | $28.93 | $29.93 | $30.43 | $30.43 |
| (T) Vacation (17.39%) | 5.03 | 5.20 | 5.25 | 5.29 |
| Health & Welfare (21.67%) | 6.27 | 6.49 | 6.54 | 6.59 |
| Pension Fund (46.01%) | 13.31 | 13.77 | 13.89 | 14.00 |
| Training School | .06 | .06 | .06 | .06 |
| GROSS | $53.60 | $55.45 | $55.92 | $56.37 |
| Training | .37 | .37 | .37 | .37 |
| Industry Promotion | .20 | .20 | .20 | .20 |
| Drug Testing & Safety | .06 | .06 | .06 | .06 |
| IMPACT | .08 | .08 | .08 | .08 |

### CONVEYOR WORK — Effective June 1, 2007

|  | JOURNEYMAN | FOREMAN | ACTING GENERAL FOREMAN | GENERAL FOREMAN |
|---|---|---|---|---|
| (T) Base | $29.43 | $30.43 | $30.68 | $30.93 |

### ODD SHIFTS — Effective June 1, 2007

|  | JOURNEYMAN | FOREMAN | ACTING GENERAL FOREMAN | GENERAL FOREMAN |
|---|---|---|---|---|
| (T) Base | $29.43 | $30.43 | $30.68 | $30.93 |

### CONVEYOR WORK Second and Third Shifts — Effective June 1, 2007

|  | JOURNEYMAN | FOREMAN | ACTING GENERAL FOREMAN | GENERAL FOREMAN |
|---|---|---|---|---|
| (T) Base | $33.31 | $35.03 | $35.60 | $35.95 |
| (T) Vacation (17.39%) | 5.79 | 6.09 | 6.19 | 6.25 |
| Health & Welfare (21.67%) | 7.22 | 7.59 | 7.72 | 7.79 |
| Pension Fund (46.01%) | 15.33 | 16.12 | 16.38 | 16.54 |
| Training School | .06 | .06 | .06 | .06 |
| GROSS | $61.71 | $64.89 | $65.95 | $66.59 |
| Training | .37 | .37 | .37 | .37 |
| * Industry Promotion | .20 | .20 | .20 | .20 |
| Drug Testing & Safety | .06 | .06 | .06 | .06 |
| IMPACT | .08 | .08 | .08 | .08 |

# DECKING
Effective June 1, 2007

| | JOURNEYMAN | FOREMAN |
|---|---|---|
| (T) Base | $24.12 | $25.12 |
| (T) Vacation (18.16%) | 4.38 | 4.56 |
| Health & Welfare | 6.11 | 6.36 |
| Pension Fund (46.52%) | 11.22 | 11.69 |
| Training School | .06 | .06 |
| GROSS | $45.89 | $47.79 |
| Training | .37 | .37 |
| * Industry Promotion | .06 | .06 |
| Drug Testing & Safety | .08 | .08 |
| IMPACT | .08 | .08 |

# STRUCTURAL FENCE
Effective June 1, 2007

| | JOURNEYMAN |
|---|---|
| (T) Base | $21.73 |
| (T) Vacation (18.16%) | 3.71 |
| Health & Welfare | 6.00 |
| Pension Fund (46.52%) | 9.02 |
| Training School | .06 |
| GROSS | $40.52 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |

*The structural fence erection rate is applicable to (1) jobs/projects where it is required that the contractor be signatory to a General Presidents' Agreement, a National Maintenance Agreement, an NCERR Agreement, an International Project Agreement or similar agreement with the International; (2) jobs/projects where the owner, general contractor or project manager requires union signatory contractors; (3) jobs/projects governed by multi-trade project agreements; (4) all fence surrounding construction sites; and (5) chainlink fence. If the Employer is signatory to the Fence Agreement, then the work referred to in provisions 4 and 5 above are covered by the Fence Agreement and wage and benefit package described therein.

The Foreman shall be selected by and be the representative of the Employer. He/She shall be a working foreman and shall be paid not less than one dollar ($1.00) per hour more than the Journeyman wage scale.

# ARTICLE 14
## IRON WORKERS DOOR WORK

This Article applies only to the erection and construction of industrial doors on unprotected jobs as defined herein. An Employer who is party to the Association Agreement may utilize the wage and benefit rates in this Article only with written consent from Local No. 25. An Employer engaged exclusively in industrial door erection and construction may obtain written consent from Local 25 to utilize this Article on all unprotected jobs. An Employer engaged partially in industrial door erection and con-

struction may obtain written consent from Local 25 to utilize this Article for each specific unprotected job. On an unprotected job where an Employer has written consent from Local 25 to utilize this Article, all provision of the Association Agreement apply except as modified by this Article.

## PROTECTED AND UNPROTECTED JOBS

A. Protected Jobs: Protected jobs are jobs/projects where, as a matter of established practice, policy or agreement, the job/project is required to be performed by a contractor signatory to the applicable building trade(s) collective bargaining agreement(s). This would include the following (1) jobs/projects where the owner, general contractor or project manager requires union signatory contractors; (2) jobs/projects where it is required that the contractor be signatory to a General Presidents' Agreement, an NCERR Agreement, an International National Maintenance Agreement, an International Project Agreement or a similar agreement with International, (3) jobs/projects where iron workers work on composite crews with millwrights; (4) jobs/projects governed by a multi-trade project agreement.

B. Unprotected Jobs: All other jobs/projects.

# DOOR RATES
On Protected Jobs, use Structural Rates
## JOURNEYMAN WAGE AND FRINGE PACKAGE
(UNPROTECTED JOBS)
EFFECTIVE JUNE 1, 2007 THROUGH MAY 31, 2008

| | |
|---|---|
| (T) Base | $23.24 |
| (T) Vacation | 2.50 |
| Health & Welfare | 4.39 |
| Pension | 5.02 |
| Training School | .06 |
| GROSS | $35.21 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |
| TOTAL | $35.92 |

# DOOR APPRENTICE RATE SCHEDULE
(UNPROTECTED JOBS)
EFFECTIVE NOVEMBER 1, 2007 THROUGH MAY 31, 2008

## LEVEL 1: 50%

| | |
|---|---|
| (T) Base | $10.44 |
| (T) Vacation 4.40% | .46 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 2.26 |
| Training School | .06 |
| GROSS | $18.21 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

## LEVEL 2: 55%

| | |
|---|---|
| (T) Base | $11.83 |
| (T) Vacation 4.40% | .52 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 2.56 |
| Training School | .06 |
| GROSS | $19.96 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 3: 60%**

| | |
|---|---|
| (1) Base | $13.23 |
| (1) Vacation 4.40% | .58 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 2.86 |
| Training School | .06 |
| GROSS | $21.72 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 4: 65%**

| | |
|---|---|
| (1) Base | $14.63 |
| (1) Vacation 4.40% | .64 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 3.16 |
| Training School | .06 |
| GROSS | $23.48 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 5: 70%**

| | |
|---|---|
| (1) Base | $16.00 |
| (1) Vacation 4.40% | .70 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 3.46 |
| Training School | .06 |
| GROSS | $25.23 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 6: 75%**

| | |
|---|---|
| (1) Base | $17.42 |
| (1) Vacation 4.40% | .77 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 3.76 |
| Training School | .06 |
| GROSS | $27.00 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 7: 80%**

| | |
|---|---|
| (1) Base | $18.83 |
| (1) Vacation 4.40% | .83 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 4.07 |
| Training School | .06 |
| GROSS | $28.77 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

**LEVEL 8: 85%**

| | |
|---|---|
| (1) Base | $20.21 |
| (1) Vacation 4.40% | .89 |
| Health & Welfare | 4.39 |
| Health & Welfare Supp. | .60 |
| Pension 21.60% | 4.37 |
| Training School | .06 |
| GROSS | $30.52 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |

Vacation contributions are calculated at a rate (based on 2009 hours of contributions) sufficient to provide paid vacations as follows: Level 1 or 2 - one week; Level 3 or 4 - two weeks; Level 5 or 6 - three weeks, and Level 7 or 8 four weeks, Level

Conveyor and Docking – use form # 3010
Rigging (Protected) – use form # 2010
Rigging Exposition workers – use form # 2012
Reinforced Journeyman – use form # 4010
Peace Erection – use form # 5015
Pre-Engineered Journeyman – use form # 5010
Siding, Glazing & Curtain Wall Journeyman – use form # 5011
Pre-Engineered Apprentice – use form # 5020
Siding, Glazing & Curtain Wall Apprentice – use form # 5050

Structual Journeyman – use form # 3002
Rigging / Non Protected – use form # 2014
Rigging Apprentice – Use form # 2016
Reinforced Apprentice – use form # 4020
Door – use form # 7010

## ARTICLE 15

### PARKING

When free parking facilities are not available, the Employer shall provide parking or pay Employees for same not to exceed Five Dollars ($5.00) per day.

## ARTICLE 16

### SHIPPING EMPLOYEES OUT OF LOCAL JURISDICTION

Employees shipped to jobs or work out of the jurisdiction of the Local Union shall receive an allowance to cover transportation, traveling time and expenses, providing they remain on the job thirty (30) days, until the job is completed if it requires less than thirty (30) days. Employees shipped to a job and not put to work, weather permitting or the job is not ready for them to go to work, shall be paid the regular wage rate for such time, or such Employees shall be shipped back to the shipping point with an allowance to cover time and transportation paid by the Employer.

## ARTICLE 17

### SURETY BONDS/SECURITY DEPOSIT

The Employer shall, upon becoming a party to this Agreement, deliver to the Trustees of the Joint Funds a surety bond or cash security in the amount set forth below to guaranty payments required to be made to the Troy Workers Local No. 25 Health Fund of Eastern Michigan; Iron Workers Local No. 25 Pension Fund; Iron Workers Local No. 25 Excess Benefit Plan; Iron Workers Local No. 25 Vacation Pay Fund; Iron Workers Local No. 25 Training Fund; Iron Workers Management Progressive Action Cooperative Trust (IMPACT); and Great Lakes Fabricators and Erectors Industry Promotion and Improvement Fund (Joint Funds), as well as credit union deductions. The Trustees of the Joint Funds are authorized to make claim against the surety bond or apply against the cash security any delinquency or liquidated damages owed by the Employer, and any cost of collection, attorney, or audit fee which arises in connection with such collection activity. The following provisions shall apply:

A. Each Employer signatory to this Agreement shall obtain a surety bond in the amount of $25,000. If an Employer is unable to obtain a surety bond, it may post surety in the form of cash (cash security) to an account administered by the Joint Funds. The account will be separate from all other accounts and shall not be commingled with accounts for any other purpose. If the Employer substitutes a bond for a cash security deposit made under this section, the security deposit will be returned to the Employer upon presentation of the surety bond.

B. If an Employer is unable to obtain a surety bond or post the cash security referenced above, the Trustees may, at their sole discretion, place the Employer on a weekly schedule of contribution payments which will require a minimum of three weeks cash security based upon an estimated amount of contributions to be determined by the Trustees.

C. If an Employer is delinquent in submitting contributions for two consecutive months, the Trustees may, at their sole discretion, increase the amount of surety bond or cash security required in an amount not to exceed the previous three months of contributions submitted.

D.  The Union agrees to accept the Associated General Contractors of America, Michigan Chapter, the Great Lakes Fabricators and Erectors Association, and the Michigan Conveyor Manufactures Association, Inc. (hereinafter referred to as Guarantor) as surety for each of its members for the payment to the Joint Funds.

E.  A Guarantor may cancel its surety obligation in its entirety or for any individual member of the association by providing ten (10) days written notice to the Union and the Joint Funds that it will no longer be surety, and thereafter, shall not be liable for accruing defaults.

F.  Each Employer member of the Guarantor, by becoming a party to this Agreement, authorizes and empowers its association to act on its behalf and, until notice in writing to the contrary to the Union and to its association is received, it shall be prima facie evidence that such association is acting as surety hereunder for said Employer.

G.  The Union shall have the right to strike the Employer after providing twenty-four (24) hour written notice to the Employer for the following violations: If the Employer has not obtained the appropriate surety bond or cash security deposit within forty-eight (48) hours of signing the Collective Bargaining Agreement; if an Employer's surety bond has been terminated or canceled; if the surety bond or cash security deposit is no longer in the appropriate amount whether due to claims made against the bond or security or any other reason, and any failure to provide or post the appropriate surety bond/cash security as provided in this Article, including but not limited to, the amount and form of the surety bond/cash security. Such acts arise as taken by the Union is excepted from the requirements of the grievance procedure provided in this Agreement. It is expressly understood that this provision does not substitute or reduce any other authority conferred upon the Joint Grievance Board under this Agreement.

H.  The surety bond must be accompanied by the following information:

1.  The full name of the surety company issuing the bond;

2.  The address of the surety company issuing the bond;

3.  The name and the address of the agent for the surety company issuing the bond for service of process;

4.  The name of the local agent for the surety company issuing the bond;

5.  The address of the local agent for the surety company issuing the bond.

I.  The Trustees of the Joint Funds reserve the right to reject a bond offered by an Employer if in its judgment the surety has unreasonably refused to pay claims on any bond previously issued and/or if it is not in the appropriate form, amount, or with the attendant information as set forth herein.

J.  The surety bond shall be by an insurance or surety company authorized to do business in the State of Michigan and shall be in the form set forth.

18

SURETY BOND CONTRACT

We, _____ as Principal, and _____ (Bonding Company Name), as Surety, are bound unto each of the following Funds and their trustees (hereafter referred to as "Obligee" and/or "Funds"):

1.  Iron Workers Local No. 25 Health Fund of Eastern Michigan

2.  Iron Workers Local No. 25 Pension Fund

3.  Iron Workers Local No. 25 Excess Benefit Plan

4.  Iron Workers Local No. 25 Training Fund

5.  Iron Workers Local No. 25 Vacation Pay Fund

6.  Ironworker Management Progressive Action Cooperative Trust (IMPACT)

7.  Great Lakes Fabricators and Erectors Industry Promotion and Improvement Fund in the sum of _____ ($_____) dollars.

It is understood that the Principal employs various personnel who perform work as defined in the Collective Bargaining Agreement between the Principal and Iron Workers Local Union No. 25. The Collective Bargaining Agreement between those parties, among other things, provides for the payment of fringe benefit contributions to the various Funds, as well as liquidated damages, attorney fees, and other costs of collection for the inaccurate, incomplete, or untimely payment of the obligations set forth in that Agreement. The condition of this obligation is that if the Principal completely and timely complies with the provisions of the Collective Bargaining Agreement regarding payment of all fringe benefit contributions, liquidated damages, attorney fees and costs of collection, then this obligation is void and of no effect. However, should the Principal not completely and timely comply with the terms of the Collective Bargaining Agreement regarding the payment of contributions, liquidated damages, attorney fees and costs of collection, then this obligation remains in full force and effect.

It is agreed that this obligation applies not only to the Principal and Surety, but to their heirs, executors, administrators, successors and assigns, jointly and severally.

It is further agreed that the Obligee/Funds are not bound by any notice provisions which may be contained in any other document submitted by the bonding company or any other statement issued by the Surety as the Obligee/Funds are bound only by the statute of limitations which applies under the law.

This bond may be canceled by the Surety giving no less than thirty (30) days written notice to the Obligee/Funds of cancellation sent by registered/certified mail.

Liability under this bond is effective for the period beginning _____ and ending _____; however, liability under the bond may be continued by a Continuation Certificate signed by the Principal and the Surety.

19

# ARTICLE 18

## FRINGE BENEFIT FUNDS

A. For all work performed, an Employer shall make contributions to the various Iron Workers' Local No. 25 Fringe Benefit Funds hereinafter described in the respective amounts and under the respective conditions set forth herein.

B. 1. Monthly contributions to all such Funds are payable and must be received by the bank depository on the 26th day of the month following the month in which the hours are worked and shall be combined and remitted in one check and payable to the "Iron Workers' Local No. 25 Fringe Benefit Funds". Such contributions shall be accompanied by remittance report forms which shall be prescribed and furnished by the Trustees of said Funds and which shall be properly completed in accordance with the instructions issued from time to time by the Trustees. The Trustees shall provide a copy of the contribution form from all contributors to the Union and the Association Office.

2. If the fringe benefits are not paid timely, the Employer must file its completed remittance report form for the month in question with the Fund Office, P.O. Box 8005, Novi, Michigan 48376-8006, showing hours worked and fringe benefits due.

3. Federal law requires that each Employer furnish the following information to the Fund Office if no men were employed during a particular month: (a) inactive, or (b) final report (reason must be given).

C. HEALTH FUND. For each Employee covered by this Agreement, an Employer shall contribute to the "Iron Workers' Health Fund of Eastern Michigan" an amount equal to the percentages as outlined in Article 13. Title to all contributions paid into and/or due and owing the Fund shall be vested in and remain exclusively in the Trustees of the Fund. Contributions become vested plan assets at the time they become due and owing to the Fund.

D. PENSION FUND. For each Employee covered by this Agreement, an Employer shall contribute to the "Iron Workers' Local No. 25 Pension Fund" an amount equal to the percentages as outlined in Article 13. Title to all contributions paid into and/or due and owing the Fund shall be vested in and remain exclusively in the Trustees of the Fund. Contributions become vested plan assets at the time they become due and owing to the Fund.

E. TRAINING FUND. For actual work performed by Employees in its employ who are covered by this Agreement, an Employer shall contribute to the "Iron Workers Local No. 25 Training Fund ("Training Fund")" an amount as outlined in Article 20. Contributions to this Fund shall be used exclusively to defray training costs as provided for in the Joint Training Program. Title to all contributions paid into and/or due and owing the Fund shall be vested in and remain exclusively in the Trustees of the Training Fund. Contributions become vested plan assets at the time they become due and owing to the Training Fund.

F. VACATION PAY FUND. For each Employee covered by this Agreement, an Employer shall contribute to the "Iron Workers' Local No. 25 Vacation Pay Fund" an amount equal to the percentages as outlined

in Article 13 of the Employer's gross earnings before taxes. The amount of contributions made on his behalf to this Fund shall be added to the Employer's gross earnings in computing withholding of his income tax and F.I.C.A. contributions. Title to all contributions paid into and/or due and owing the Fund shall be vested in and remain exclusively in the Trustees of the Fund. Contributions become vested plan assets at the time they become due and owing to the Fund.

G. IMPACT FUND. For each employee covered by this Agreement, the Employer shall contribute $.08 per hour for each hour worked to Iron Worker Management Progressive Action Cooperative Trust (IMPACT), a jointly trusted Labor-Management Trust with federal tax exempt status under Section 501(c)(5) of the Internal Revenue Code as an exempt organization under Section 501(c)(5) of the Internal Revenue Code. The general purpose of the Trust include the improvement and development of the Iron-worker industry through Education, Training, Communication, Cooperation and governmental lobbying and legislative initiatives. The reporting, payment, frequency of payment and administration of such contributions shall be governed by the terms of the IMPACT Trust Agreement, policies and resolutions.

H. EXCESS BENEFIT FUND. The parties hereby agree to create an Excess Benefit Plan Fund ("Fund") to pay any benefits in excess of the Section 415 Limits.

1. The Administrator of the Iron Workers' Local No. 25 Pension Plan ("Plan") will, on a monthly basis determine the amounts to be paid to beneficiaries from the Fund in the following month. Said amount being the mathematical calculated Defined Benefit in excess of the payment permitted under IRC §415. Said amount is to be further increased to reflect the F.I.C.A. taxes due thereon so that the payment net of the F.I.C.A. taxes to be paid to the Employee would be the same amount he would be entitled to without the payment being subject to said taxes.

2. Prior to the payment of the Employer contributions to the Plan, the Administrator shall deduct the necessary moneys to pay the aforementioned amount to the Fund.

3. The payments to each of the beneficiaries for the month will be first remitted from the Plan in the amount as restricted pursuant to IRC §415, and supplemented by any amount determined to be paid to them from the Excess Benefit Fund.

J. Any person who performs work covered by Article 2 of this Agreement (Jurisdiction) and who has any direct or indirect financial interest in his Employer (e.g., proprietor, partner, shareholder, etc.) will make contributions to the Funds based either on the most hours worked by any iron-worker employee or on the actual hours worked by such person, whichever is greater, for any month in which such person performs covered work. Contributions are not required for any month in which such person performs no covered work.

K. The Health, Pension, Training, Vacation Pay and Excess Benefit Funds shall be administered jointly by an equal number of representatives of the Employers and Union, in accordance with the respective Agreements and Declarations of Trust pursuant to which they are established. Said Agreements and declarations of Trust shall conform to all requirements

of law and copy of same, together with any amendments thereto, shall be considered as part of this Agreement as though they were set forth herein at length.

Iron Workers' Local Union No. 25 shall elect, designate or appoint the Union Trustees, and the Great Lakes Fabricators and Erectors Association shall appoint the Employer Trustees to the Health, Pension, Training, Vacation Pay and Excess Benefit Funds.

L. If, in doing work outside the geographical jurisdiction of the Union, an Employer is required to make contribution to another Health, Pension, Training, Vacation Pay and Excess Benefit Funds on behalf of Employees covered by this Agreement, he shall not be required to make duplicate contributions for the same man hours of work to the similar Fund or Funds described herein.

M. By execution of this Agreement, an Employer, whether or not a member of an Employer Association which is a party hereto, authorizes such Employer Association to enter into appropriate Trust agreements necessary for the administration of the foregoing Fringe Benefit Funds and to designate the Employer Trustees under such Agreements and hereby waives all notice thereof and ratifies all actions already taken or to be taken by such Trustees within the scope of their authority.

N. The Employer agrees to adopt, abide by, and to be bound by all of the provisions of the Collective Bargaining Agreement heretofore entered into between Local Union No. 25 and the Association, and any modifications, extensions or renewals thereof, with the same force and effect as though the aforesaid Collective Bargaining Agreement were set forth here in full.

O. The Employer agrees to be bound by all the terms and provisions of:

1. The Agreement and Declaration of Trust dated November 30, 1950, and all amendments and restatements thereto of the Iron Workers' Health Fund of Eastern Michigan;

2. The Agreement and Declaration of Trust dated May 8, 1956, and all amendments and restatements thereto of the Iron Workers' Local No. 25 Pension Fund;

3. The Agreement and Declaration of Trust dated November 16, 1967, and all amendments and restatements thereto of the Iron Workers Local No. 25 Training Fund;

4. The Agreement and Declaration of Trust dated May 1, 1962, and all amendments and restatements thereto of the Iron Workers' Local No. 25 Vacation Pay Fund;

5. The Agreement and Declaration of Trust dated January 4, 1996, and all amendments and restatements thereto of the Iron Workers' Local No. 25 Excess Benefit Fund with the same force and effect as though the Agreements and Declarations of Trust referred to above were set forth here at length and the Employer originally signed the said Agreements and Declarations of Trust, and the Employers agree to make payments covering all of their Employees represented in Local No. 25 to said Funds as required by the Collective Bargaining Agreement and any modifications or amendments thereto, and the Agreements and Declarations of Trust of the aforesaid Funds.

The Employer hereby authorizes the Employer Trustees named in aforesaid Agreements and Declarations of Trust and their successors to act for and on his behalf.

P. An Employer who fails or refuses to make required contributions by the 26th of the month per Section D of this Article, agrees to pay liquidated damages for late payment and the cost of collection resulting from the late payment of contributions. The liquidated damages based on the length of time such contributions are due, the amount of delinquent contributions, the date payment is actually made, and the administrative expense required to collect the delinquent fringe benefits. Liquidated damages will be assessed against the delinquent Employer at 3% over the prime rate established by Comerica Bank, located in Detroit, Michigan on the date the delinquency first occurs and will be computed for each date the delinquency exists.

The Employer understands and agrees that the Trustees of the Fringe Benefit Funds provided for in this Agreement have the power, as provided for in their respective Trust Agreements, to fix the above schedule of liquidated damages and to revise the schedule of liquidated damages at their discretion in order to properly compensate the Funds for the damages caused by the delinquency.

Acceptance of any contributions by the Fringe Benefit Funds or their Trustees or Administrator thereof shall not constitute a waiver of the right to assess liquidated damages if such contributions are paid after the due date.

These liquidated damages do not preclude the Trustees from exercising their legal rights and remedies to which they may be entitled under ERISA or other law, whether or not legal action is commenced to collect the delinquencies.

Payment of these liquidated damages must be made payable to "Iron Workers' Local No. 25 Fringe Benefit Funds" in accordance with the instructions issued by the Trustees of said Funds.

All liquidated damages paid and collected in accordance with the foregoing provisions will be allowed by the Trustees of the Fringe Benefit Funds among the Funds on a proportionate basis.

Q. The Employer agrees to pay costs and expenses of collection of contributions, including attorney fees and costs, accounting or auditing fees and costs, or other associated costs expended in order to enforce the obligations of the Employer, including, but not limited to, the payment of contributions, liquidated damages, surety bond provisions, enforcement of audit procedures and collection of audits regardless of whether litigation was commenced or not.

R. The Employer agrees to furnish to the Trustees of the various Fringe Benefit Funds, provided for in this Agreement, upon request, such information and reports as the Trustees may require in the performance of their duties. The Employer further agrees that the Trustees, or any agent authorized by the Trustees, shall have the right to enter upon the premises of the Employer to perform an audit and to have access to such of the Employer's records as may be necessary to permit the Trustees to determine whether the Employer is complying fully with the provision of this Agreement regarding contributions. Should a shortage in contributions be determined as a result of an audit, the Employer agrees

to pay a liquidated damage in the amount of seven percent (7%) of the total shortage found.

S. If an Employer is placed on a payment schedule pursuant to an agreement with the Trustees, The Company shall be charged at a rate of three percent (3%) over the prime rate as established by Comerica located in Detroit, Michigan for any fringe benefit and/or delinquent contributions due the Fringe Benefit Funds.

T. Notwithstanding any other provision of this Agreement, in the event any Employer is delinquent at the end of any period in the payment of any of his obligations under this Agreement, the Union and the Fringe Fund Trustees have the right to take such action(s) they determine necessary until such delinquent payments are made, including but not limited to the Union's right to engage in a strike, provided the Union or Fund Trustees have first given the Employer twenty-four (24) hours notice of delinquency. In the event such action(s) is taken, the Employer will be responsible to all affected employees for any further losses resulting from such action(s). The Fund Trustees have the further right to take any available legal action against a delinquent Employer to collect delinquent contributions.

When the Union engages in a strike for the collection of delinquent payments, such strike action will be expressly excepted from the Joint Grievance Board provisions of this Agreement. However, Article 18, T does not replace or reduce any authority of the Joint Grievance Board.

U. Nothing in this Agreement shall limit the Trustees' right to resort to all legal and contractual remedies available to them which in their discretion may be advisable or necessary to enforce the obligations of the Joint Funds. At the discretion of the Trustees of the Joint Funds or the Administrator of same, any Employer may be ordered to show compliance with the terms and provisions of this Agreement.

V. In the event an Employer's contribution to the Fringe Benefit Funds does not meet the entire obligation, and a shortage occurs that is deemed uncollectible, any monies paid shall be applied first to 100% of the outstanding balance of the second listed Fund, and then 100% to the outstanding balance of the second listed Fund, and continuing in such a manner to each successive Fund until such contributions have been exhausted.

1. Vacation Pay Fund
2. Health Fund
3. Pension Fund
4. Training Fund
5. Industry Promotion and Improvement Fund
6. Ironworker Management Progressive Action Cooperative Trust (IMPACT)

The Employer shall remain liable for the outstanding balance due and owing to any of the remaining Funds pursuant to the terms and conditions of this Agreement.

W. Michigan Statutes Annotated 29.535(1). Any Employer who promises in writing to make payments to an Employee Welfare Plan, Vacation Plan, Health Plan, Dental Plan, Profit Sharing Plan, or any Employees' Welfare Plan, either by contract with an individual Employee, by collective bargaining agreement, or by agreement with such Employee

Plan, and who fails to make such payments within three (3) weeks after they become due and payable, shall be guilty of a misdemeanor. This section shall not apply for the failure to make payments if prevented by an act of God, proceedings in bankruptcy, order or processes of any court or of competent control. Conviction for violation of this section does not relieve the Employer of liability for moneys under such contract agreement.

## ARTICLE 19
## INDUSTRY PROMOTION AND IMPROVEMENT FUND

The parties to this Agreement agree that the Steel Fabrication and Erection Industry can do much to promote and better itself. During the past several years, many inferior products have been made by Employers in the industry that reflects on the product and service of all companies. In solution to the problems of higher quality products and services is still being sought. To further the legitimate object of promoting and improving the Steel Fabrication and Erection Industry, together with related products, the Great Lakes Fabricators and Erectors Association, the Michigan Conveyor Manufacturers Association and the Associated General Contractors of America, Michigan Chapter have agreed effective June 1, 2007 to contribute twenty cents ($.20) per hour worked for each Employee hired under the terms of this Agreement, payable monthly into an Industry Promotion and Improvement Fund. This Fund shall be administered by three (3) Employer Trustees, who shall represent all Employers from whom contributions are required, under a written Agreement and Declaration of Trust, which is herewith by reference made a part of this Agreement. The Industry Promotion and Improvement Fund shall be used for the following general purpose:

1. To promote and improve the Steel Fabrication and Erection Industry through a system of public and customer education information.

2. By advertising and dissemination of information, point out to the general public the merits of high quality products, services, etc.

3. To do research with a view to improving the quality of the services and products of the industry.

4. To strive for better understanding between Employers and their customers, between such Employers and the general public, and between Employers and their Employees and to ensure to them, the faithful performance and integrity of various fringe benefit funds. The Administrator is authorized to create a reporting form to include all fringe benefit contributions, as well as a space for the Industry Promotion Fund which shall be deposited in accordance with the direction of the Trustees of the Industry Promotion Fund. The Great Lakes Fabricators and Erectors Association will make available to the Union their annual audit as prepared by a certified public accountant for the preceding fiscal year.

The Associated General Contractors of America, Michigan Chapter (AGC), has agreed with the Great Lakes Fabricators and Erectors Association that they will pay into their Industry Promotion and Improvement Fund an amount of twenty cents ($.20) per hour worked for each Employee hired under

the terms of this Agreement. The AGC and Great Lakes Fabricators and Erectors Association have entered into a separate agreement to share industry promotion revenue and information. The Trustees shall furnish the AGC a copy of the Declaration of Trust and the IRS exemption letter relating to the declaration of Trust. The AGC shall also be furnished a copy of the annual audit, as prepared by a certified public accountant. The Industry Promotion Fund shall be used to promote the Industry in general and maintenance contracts covering work performed by iron workers.

The Michigan Conveyor Manufacturers Association Industry Advancement Program shall be paid an amount equal to one cent ($.01) for each twenty cents ($.20) in contributions to Great Lakes Fabricators and Erectors Industry Promotion and Improvement Fund under the terms of this Agreement. The Administrator of the Ironworkers Local 25 Fringe Benefit Funds will make the division of revenue and transfer the applicable amount into each Association's industry advancement fund.

The Trustees of the Great Lakes Fabricators and Erectors Industry Promotion and Improvement Fund shall furnish the Michigan Conveyor Manufacturers Association with a copy of the annual audit, prepared by a certified public accountant, if requested by the Michigan Conveyor Manufacturers Association in writing and the Trustees of the Michigan Conveyor Manufacturers Association Industry Promotion Fund shall furnish the Great Lakes Fabricators and Erectors Association with a copy of its annual audit, prepared by a certified public accountant, if requested by the Great Lakes Fabricators and Erectors Association in writing.

5. Any Employer who is not contractually obligated to contribute to the Industry Promotion Fund, and who elects not to contribute to the Industry Promotion Fund, is obligated to contribute an additional $.20 to the Training Fund (for a total of $.57 per hour).

6. The Employer shall indemnify and hold harmless Workers Local Union No. 25 against any and all liabilities that may arise by reason of the Union complying with the terms of this Article.

## ARTICLE 20

## TRAINING FUND

A. The parties signatory to this Agreement agree to abide by the Apprenticeship Standards of the Local Union No. 25 Joint Apprenticeship Committee as approved by the U.S. Dept. of Labor Bureau of Apprenticeship and Training. It is further agreed that all rules and actions taken by the Joint Labor Management Training Committee and agreed to by the Labor Management Negotiating Committees should be abided by.

B. The contribution into the Training Fund shall be at the rate of thirty-seven cents ($.37) per hour worked, for each Employee. The Administrator is authorized to make a reporting form which includes all Fringe Benefit contributions and an added space for Training Fund.

C. Apprentices will attend block training. The Employers agree to contribute an additional $.60 into the Health Fund (as a Health and Welfare Apprentice Supplement) beginning November 1, 2007 for each hour paid to an apprentice.

In addition, subject explicitly to the ongoing approval of the trustees of the Pension Fund, apprentices shall be granted credited service for eligibility and vesting purposes for the time engaged in block training. The attendance requirements necessary to receive this credited service will be decided by the Joint Labor Management Training Committee.

D. Each Apprentice shall serve a term as established by the Joint Training Committee and, except on Unprotected Door jobs under the Door Article, his rate schedule shall be based on the Structural Journeyman rate schedule set forth below. The Apprentice schedule will be increased on June 1, 2008 and June 1, 2009 based on the increases in the Structural Journeyman gross package.

## APPRENTICE RATE SCHEDULE
## EFFECTIVE NOVEMBER 1, 2007 THROUGH MAY 31, 2008

**LEVEL 1: 55%**
- (T)Base ............... $15.91
- (T)Vacation 17.39% ...... 2.77
- Health & Welfare 39.41% ... 6.27
- Health & Welfare Supp. ... .60
- Pension 28.28% ........ 4.50
- Training School ........ .06
- GROSS ............. $30.11
- Training ............ .37
- * Industry Promotion ..... .20
- Drug Testing & Safety ... .06
- IMPACT ............. .08

**LEVEL 2: 55%**
- (T)Base ............... $15.91
- (T)Vacation 17.39% ...... 2.77
- Health & Welfare 39.41% ... 6.27
- Health & Welfare Supp. ... .60
- Pension 28.28% ........ 4.50
- Training School ........ .06
- GROSS ............. $30.11
- Training ............ .37
- * Industry Promotion ..... .20
- Drug Testing & Safety ... .06
- IMPACT ............. .08

**LEVEL 3: 60%**
- (T)Base ............... $17.36
- (T)Vacation 17.39% ...... 3.02
- Health & Welfare 36.12% ... .60
- Pension 31.56% ........ 5.48
- Training School ........ .06
- GROSS ............. $32.79
- Training ............ .37
- * Industry Promotion ..... .20
- Drug Testing & Safety ... .06
- IMPACT ............. .08

**LEVEL 4: 65%**
- (T)Base ............... $18.80
- (T)Vacation 17.39% ...... 3.27
- Health & Welfare 33.34% ... .60
- Pension 34.34% ........ 6.46
- Training School ........ .06
- GROSS ............. $35.46
- Training ............ .37
- * Industry Promotion ..... .20
- Drug Testing & Safety ... .06
- IMPACT ............. .08

## LEVEL 5: 70%

| | |
|---|---:|
| (T)Base | $20.26 |
| (T)Vacation 17.39% | 3.52 |
| Health & Welfare 30.5% | 6.27 |
| Health & Welfare Supp. | .60 |
| Pension 36.75% | 7.44 |
| Training School | .06 |
| GROSS | $38.15 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |

## LEVEL 6: 75%

| | |
|---|---:|
| (T)Base | $21.70 |
| (T)Vacation 17.39% | 3.77 |
| Health & Welfare 39.41% | 6.27 |
| Health & Welfare Supp. | .60 |
| Pension 38.76% | 8.42 |
| Training School | .06 |
| GROSS | $40.82 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |

## LEVEL 7: 80%

| | |
|---|---:|
| (T)Base | $23.14 |
| (T)Vacation 17.39% | 4.02 |
| Health & Welfare 27.0% | 6.27 |
| Health & Welfare Supp. | .60 |
| Pension 40.59% | 9.39 |
| Training School | .06 |
| GROSS | $43.48 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |

## LEVEL 8: 85%

| | |
|---|---:|
| (T)Base | $24.59 |
| (T)Vacation 17.39% | 4.28 |
| Health & Welfare 25.50% | 6.27 |
| Health & Welfare Supp. | .60 |
| Pension 42.18% | 10.37 |
| Training School | .06 |
| GROSS | $46.17 |
| Training | .37 |
| * Industry Promotion | .20 |
| Drug Testing & Safety | .06 |
| IMPACT | .08 |

Structural Journeymen - use form # 3002
Conveyor and Docking - use form # 5000
Rigging / Protected - use form # 3010
Rigging Exposition workers - use form # 2012
Reinforced Journeymen - use form # 4010
Piano Direction - use form # 5015
Pre-Engineered Journeymen - use form # 5010
Pre-Engineered Apprentice - use form # 5011
Siding, Glazing & Curtain Wall Journeymen - use form # 5050
Siding, Glazing & Curtain Wall Apprentice - use form # 5060

Structural Apprentice - use form # 3003
Rigging / Not Protected - use form # 2014
Rigging Apprentice - Use form # 2016
Reinforced Apprentice - use form # 4020
Door - use form # 7010

G. The parties agree that in the event Iron Workers Local 25 are unable to furnish manpower to an Employer signatory hereunder, the Employer may hire a probationary member to be paid fifty-five percent (55%) of the Journeyman's Base wage with applicable fringe benefits. However, in the event Journeymen Iron Workers and/or Apprentices become available, the Employer shall be obligated to lay off probationary members and hire Journeymen Iron Workers and/or Apprentices within two (2) weeks' notice provided by Iron Workers Local 25.

F. Any one Employer shall be permitted to employ Apprentices on structural, reinforcing, or rigging jobs at the ratio of not more than one (1) Apprentice to every four (4) Journeymen and shall be permitted to employ Apprentices on ornamental jobs at the ratio of not more than one (1) Apprentice to every one (1) Journeymen, and on the spinning of cables on suspension bridges, one (1) Apprentice shall be permitted to each Journeyman.

E. Monies collected by the Administrator for the Training Fund shall be deposited in accordance with direction of the Trustees of the Training Fund.

# ARTICLE 21
## DRUG AND ALCOHOL TESTING PROGRAM AND SAFETY PROGRAM

1. The Union and the Association have agreed to the established MUST Drug and Alcohol Testing Program as the only available program which may be adopted by an Employer. Each Employer may adopt the MUST Program on a companywide or project/job basis provided the Employer notifies the Union in writing.

2. The Union and the Association have agreed to the MUST Safety Program.

3. In the event the MUST Safety Program become unavailable, the Union and the Association will endeavor to agree on a successor program.

4. Each employer will contribute $.06 per hour for all hours worked to the Industry Promotion Fund for the cost of the Association administering these programs or any successor programs agreed to by the Union and the Association. [NOTE: This $.06 per hour is in addition to the $.20 per hour contribution to the Industry Promotion Fund set forth in Article 19]

The Union agrees to negotiate modifications to the right to test, where such modifications are required by contract with an owner.

# ARTICLE 22
## LABOR MANAGEMENT COMMITTEE

There shall be a Joint Labor Management Committee established for the purpose of promoting cooperation and understanding between the parties with respect to the interpretation and operation of the Collective Bargaining Agreement. The Joint Labor Management Committee shall be composed of six (6) representatives, three (3) appointed by the Great Lakes Fabricators and Erectors Association and three (3) appointed by Iron Workers Local Union No. 25.

The Joint Labor Management Committee shall have no authority to bind either party to a particular contract interpretation, nor shall it have authority to alter, amend, modify, delete, or add to any of the terms of the Collective Bargaining Agreement. It is the intention of the parties that the Joint Labor Management Committee shall be advisory only and that it shall not in any way affect the authority and jurisdiction of the Joint Grievance Board.

# ARTICLE 23
## OPTIONAL WORK WEEK

The Union agrees that the Employer may work a 4-10 work week on a particular job as provided below only under the following circumstances:

Upon mutual agreement between the Business Manager of Iron Workers Local No. 25 and the Contractor at the beginning of a job or at any time during its duration, and for a minimum of one (1) week, the Employer shall have the option of scheduling work on Monday through Thursday for ten (10) hours each day at straight-time. Work in excess of

ten (10) hours but less than twelve (12) hours per day (Monday through Thursday) shall be paid at time and one-half (1½). Work in excess of twelve (12) hours per day (Monday through Thursday) shall be paid at double (2) time. The four-ten (4-10) work week may be used by an Employer on a job basis. The four-ten (4-10) work week may be used only under the following circumstances:

A. When the Employer elects to use the four-ten (4-10) work week under this Article, he will notify the Local Union involved and inform the Local Union of the work schedule as soon as possible prior to the implementation.

B. In the event one (1) or more hours of work are unable to be performed because of bad weather when four-tens (4-10s) are worked (Monday through Thursday), the Employer may reschedule work on Friday of that week for a minimum of eight (8) hours. Work in excess of forty (40) hours for the week (Monday through Friday) but not more than fifty (50) hours for the week (Monday through Friday) shall be paid at time and one-half (1½). Work in excess of fifty (50) hours for the week (Monday through Friday) shall be paid at double (2) time. Ten (10) hours of work may be performed on Saturdays at time and one-half (1½). Work on Saturdays in excess of ten (10) hours shall be paid at double (2) time. If required to work on Sunday, double (2) time the prevailing rate of pay will be paid for all hours worked.

C. On any job scheduled to work on Friday the Employer shall not bring Employees to the job to avoid the payment of premium time.

D. For days when ten (10) hours of work is scheduled Article 24 shall apply with the modification that five (5) hours shall be substituted for four (4) hours.

E. When work is performed under the four-ten (4-10) work week schedule, payday shall be one of the workdays. Once payday has been established on a project under this Section that day shall remain the pay-day whenever four-tens (4-10's) are worked.

F. If said Holiday falls on Monday, or is celebrated on a Monday, ten (10) hours per day shall be paid for at the straight time prevailing rate of pay on Tuesday through Friday. If work is done on any said Holiday, double (2) time the prevailing rate of pay will be paid for all hours worked.

## ARTICLE 24

## SHOW-UP TIME

Two (2) hours show-up time shall be paid at the prevailing rate of wages if the man reports on the job at the scheduled starting time and if, through no fault of his own, he cannot work and remains on the job at the request of the Employer or the Employer's representative. If the man starts to work after the first two (2) hours, he shall receive four (4) hours pay at the prevailing rate. When men are dispatched from the Union hall, the show-up time rate shall prevail on their behalf.

Where an Iron Worker General Foreman or Foreman assigns work to an Employee during the period of show up time, the assigned work shall be performed, weather permitting, in order for the Employee to be eligible for show up time.

The Iron Worker General Foreman or Foreman will consider the safety and well being of the Employee before assigning work during the period of show up time.

## ARTICLE 25

## FOREMAN AND GENERAL FOREMAN

When two (2) or more Employees are employed, one (1) shall be selected by the Employer so act as Foreman and receive a Foreman's wages, and the Foreman is the only representative of the Employer who shall issue instructions to the workmen.

When working as a Foreman or Pusher Foreman, an Employee shall be guaranteed a forty (40) hour week, except as modified as follows:

A. If a job is completed or is terminated, or if work is temporarily suspended, a Foreman can be laid off at the finish of such completion, termination or suspension, provided he is paid eight (8) hours for the last day worked.

B. He must be available for work during period, or periods, for which he is paid.

C. He shall be guaranteed a forty (40) hour week with the commencement of the job.

D. When an Employee working as a Foreman or Pusher Foreman has qualified for the guaranteed forty (40) hour week and a holiday falls within the work week (Monday through Friday) and the job is not worked on said holiday, the Employee shall receive pay for a full forty (40) hour week, provided all other conditions are satisfied. The Employer shall not be obligated to duplicate holiday payments.

E. All overtime pay, and overtime premium pay shall receive separate consideration and not make a part of the guaranteed forty (40) hour week.

F. When two (2) Foremen are employed supervising crews of men, one (1) shall act as General Foreman and receive no less than twenty-five cents ($.25) per hour above the Foreman's rate.

G. When there are three Foreman or more, the General Foreman shall work in a supervisory capacity over the Foreman and receive no less than fifty cents ($.50) per hour above the Foreman's rate.

H. When the Foreman and any portion of his crew are temporarily reassigned to another job site, the Steward shall be among those temporarily reassigned.

There shall be no restriction as to the employment of Foremen or Pushers. The Employer may employ on one piece of work as many Foremen or Pushers as in his judgment is necessary for the safe, expeditious and economical handling of the same.

## ARTICLE 26

## IRON WORKERS REQUIRED ON GUY AND STIFF LEG DERRICKS STEEL ERECTION AND ON ALL MOBILE OR POWER OPERATED RIGS

A. No less than six (6) men and a Foreman shall be employed around any guy or stiff leg derrick used on steel erection.

B. On all mobile or power-operated rigs of any description no less than four (4) men and a Foreman shall be employed.

C. On small operations it will not be mandatory for an Employer to use four (4) men and a Foreman on mobile rig work, nor requiring this number of men. This does not relieve the Employer of his responsibility to man the job safely. A small operation is defined as a thirty (30) picks of one (1) ton or less per pick and/or not to exceed eight (8) hours of rig time.

## ARTICLE 27
## MARKET RECOVERY AGREEMENT

Market Recovery: It is recognized by the parties that in certain areas of the state, the Local 25 represented construction market has been threatened by non-signatory competition. Where the minimal interest of the Great Lakes Fabricators and Erectors Association, the Associated General Contractors of America, Greater Detroit Chapter, Inc., the Michigan Conveyor Manufacturers Association Inc. and Iron Workers Local Union No. 25 are served by cooperating to compete more effectively, it is agreed that the Great Lakes Fabricators and Erectors Association, the Associated General Contractors of America, Greater Detroit Chapter, Inc., the Michigan Conveyor Manufacturers Association Inc. and Iron Workers Local Union No. 25 to join a market recovery rate is negotiated it shall be the responsibility of the Association to notify Employers of the existence of such rate or agreement.

A market recovery rate negotiated pursuant to this provision shall not be considered a more favorable rate or agreement.

## ARTICLE 28
## BUSINESS REPRESENTATIVE

The Business Representative of the Union shall be permitted to visit all jobs, but will in no way interfere with the progress of the work.

## ARTICLE 29
## JOB STEWARD

A. There shall be a working Steward on each job requiring two (2) or more men who shall be appointed by the Business Manager. The Steward shall keep a record of workers laid off and discharged and take up all grievances on the job and try to have same adjusted, and in the event the Steward cannot adjust them the Steward must promptly report that fact to the Business Agent who shall report same to the proper office of the Union so that efforts can be made to adjust any matter without a stoppage of work. The Steward shall see that the provisions of this Agreement are complied with and report to the Union the true conditions and facts. The Steward shall promptly take care of injured workers and accompany them to their homes or to a hospital, as the case may require, without any loss of time, and report the injury to the proper offices of the Union. The Steward shall not have authority to cause a work stoppage on any job of a Union Contractor.

The Employer agrees that the job Steward will not be discharged without just cause and immediate notification to the Union Business Manager. When Employees are laid off, the job Steward will be the last man laid off, providing he is capable of performing the work in question.

## ARTICLE 30
## PROTECTION OF UNION PRINCIPLES

The removal of Journeyman Iron Workers and Apprentices from a job in order to render legal assistance to other Local Unions to protect union principles shall not constitute a violation of this Agreement, provided such removal is first approved by the General Executive Board and a one day's notice thereof is first given to the Employer involved, but by this paragraph a secondary boycott is neither authorized nor approved.

## ARTICLE 31
## SUBCONTRACTORS

A. On-Site Work

1. With respect to on-site work covered by the agreement, i.e. work done or to be done at the site of the construction, alteration, or repair of a building, structure or other work:

   a. The terms and conditions of this Agreement insofar as it affects the Contractor shall apply equally to any Subcontractor under control of, or working under contract with such Contractor on any on-site work covered by this Agreement, and said Subcontractor with respect to such on-site work shall be considered the same as a Contractor covered hereby.

   b. If a Contractor shall subcontract on-site work as herein defined and covered by this Agreement, provision shall be made in such subcontract for the observance by said Subcontractor of the terms of this Agreement as to such work.

2. If is distinctly understood and agreed that this Agreement does not cover any other jobs or projects of the Subcontractor and terminates contemporaneously with the termination of such subcontract with Contractor.

3. The foregoing shall not apply to the local production of material by any commercial supplier of such materials who has been and is engaged in the business of supplying such materials to the public generally from any designated site or sites other than on the project or projects of the Contractor.

B. Definition of Subcontractor

A Subcontractor is defined as any person (other than an Employee covered by this Agreement), firm or corporation who or which agrees orally or in writing to perform, or who or which in fact performs for or on behalf of a Contractor, any part or portion of the work covered by this Agreement.

C. It is distinctly understood and agreed between the Contractor and the Union that this Article has no application to any person or entity on any job or project or in the performance of any work by the person or entity when the person or entity is not a Subcontractor as defined in Subparagraph B above, and that no Subcontractor, as defined in Subparagraph B above, may be required or required by the Union while acting and working as a Subcontractor, as defined in Subparagraph B above, to execute any Agreement with the Union except a job agreement applicable only to such subcontracted work covered by the agreement.

D. If due to governmental imposed conditions, the Contractor is required to sublet certain portions of a project provisions shall be made in such subcontract for the hourly payment of fringes into the appropriate Trust Funds as specified herein.

E. A signatory Employer may not avoid application of this Agreement by double-breasting or similar device.

## ARTICLE 32

### SETTLEMENT OF DISPUTES: JOINT GRIEVANCE BOARD

A. A Joint Grievance Board will be established consisting of three (3) individuals appointed by the Association and three (3) individuals appointed by the Union. When necessary, the Association and the Union will appoint alternate(s) to serve in the place of a regular member(s) of the Joint Board. Upon mutual agreement between the Association and the Union, the Joint Grievance Board may be convened with less than six (6) members in attendance. In the event that either the Association or the Union shall have a numerical advantage on a board so convened, the voting strength of each shall be adjusted so that the total number of votes accorded the Association and the Union shall remain equal.

For any grievance filed against a member of the Michigan Conveyor Manufacturers Association, any grievance involving Article 10, or other grievance concerning conveyor work, the Great Lakes Fabricators and Erectors Association shall notify and permit the Michigan Conveyor Manufacturers Association to appoint one member (MCMA Member) to the Joint Grievance Board. Failure of the MCMA Member to attend and participate in the hearing at a mutually agreeable date and time, and such agreement may not be unreasonably withheld, shall not affect the authority of the Joint Grievance Board or otherwise act and decide the grievance. The Michigan Conveyor Manufacturers Association shall provide a list of its members to the Great Lakes Fabricators and Erectors Association. Any other grievance "concerning conveyor work" means grievances filed by Local 25 on a form which has a dedication or box to indicate whether the grievance involves conveyor work. Failure of Local 25 to identify the grievance as involving conveyor work, and which results in failure of a MCMA Member to be appointed to the Joint Grievance Board, renders any such grievance null, void and not arbitrable and the grievance shall be resubmitted to the Joint Grievance Board and the MCMA shall be permitted to appoint one member of the Joint Grievance Board. Failure of a MCMA Member to be appointed to the Joint Grievance Board for grievances involving members of the Michigan Conveyor Manufacturers Association or Article 10, renders any such decision of the Joint Grievance Board null, void and not arbitrable and the grievance shall be resubmitted to the Joint Grievance Board and the MCMA shall be permitted to appoint one member to the Joint Grievance Board.

B. The Joint Grievance Board will appoint a secretary. The Joint Board will meet as soon as practical and no later than 45 days after written notice from the secretary or any member of the Joint Board to hear and decide all grievances regarding the interpretation of this Agreement or conditions of employment existing between the Association (including any Employer member of the Association) or any other Employer signatory to this Agreement and the Union. The Union, the Association, an individual Employer or the Fringe Benefit Funds may submit a grievance to the Joint Board. The grievance will be submitted in writing. Within seven

(7) days after the grievance has been heard by the Joint Board, the Board will issue its decision. A majority vote of the Joint Grievance Board as convened will be a final and binding decision.

C. Any grievance that has not been satisfactorily settled or decided by a majority vote of the Joint Board in accordance with Section B may be submitted to arbitration before an impartial arbitrator upon the request of either party to the grievance. If the parties to the grievance do not mutually agree upon an arbitrator within five days after a request to arbitrate, either party may request a panel of 7 arbitrators from the Federal Mediation & Conciliation Service. The last remaining name will be the impartial arbitrator & Conciliation Service. The parties will flip a coin to determine the order of striking. The arbitrator will be final and binding on the parties. The decision and expenses of the arbitrator will be split by the parties to the grievance.

D. The above provision does not qualify or subject to change any term or condition of employment specifically covered by this Agreement or apply to any dispute as to the terms of any proposed new Agreement between the parties.

E. Wage and overtime claims will be considered only for the thirty (30) day period prior to the filing of a grievance by the Employee or the Union.

F. The Trustees of the Joint Fringe Benefit Funds may, but are not required to, utilize the Joint Grievance Board as a means to enforce an Employer's fringe benefit payment obligations. Resort to the Grievance board is in addition to and does limit the Trustees' right to pursue all other legal or contractual remedies.

## ARTICLE 33

### STRIKES AND LOCKOUTS

A. It is mutually agreed that there shall be no strikes authorized by Union or no lockouts authorized by the Employer, except for the refusal of either party to submit to arbitration, in accordance with Article 32 or failure on the part of either party to carry out the award of the arbitration.

B. Every facility of each of the parties is pledged to immediately overcome any such situation provided, however, it shall not be a violation of any provision of this Agreement for any person covered by this Agreement to refuse to cross or work behind the picket line of any affiliated union which has been authorized by the international of that union, the Central Labor Council or Building and Construction Trades Council.

## ARTICLE 34

### SCOPE OF AGREEMENT

This Agreement contains all of the provisions agreed upon by the Employers and the Union. Neither the Employers nor the Union will be bound by rules, regulations or agreements not contained in this Agreement except interpretations or decisions of the Joint Grievance Board.

## ARTICLE 35

### SAVINGS CLAUSE

A. Should any part of this Agreement be declared invalid by reason of any existing or subsequently enacted legislation, or by any decree of a court of competent jurisdiction, the invalidated part of this Agreement shall not invalidate the remaining portions, provided, however upon such invalidation the signatory parties agree to immediately meet to renegotiate such parts affected.

B. It is the mutual intent of the parties to negotiate an agreement which complies in every respect with all applicable State and Federal laws and regulations.

C. The remaining parts or provisions shall remain in full force and effect.

### ARTICLE 36

### EQUAL TREATMENT CLAUSE

If the Union shall furnish Employees to any Employer in the geographical jurisdiction of the agreement for the type of work covered by this Agreement upon any more favorable terms or conditions (including wage rates and overtime work) than those contained herein, except in a project agreement for maintenance by contract, as developed by the General President's Committee, the Union agrees that such more favorable terms and conditions shall automatically be extended to the Employers covered by this Agreement.

### ARTICLE 37

### SUCCESSOR CLAUSE

This Agreement shall be binding on the Employer, its successors and assigns. Employer will notify the union a minimum of thirty (30) days prior to any change in company name, ownership or address.

### ARTICLE 38

### RENEWAL CLAUSE

This Agreement shall remain in full force and effect until May 31, 2010, and shall renew itself from year to year unless either party shall notify the other party, in writing by certified mail, at least ninety (90) days prior to any anniversary date of this Agreement of its desire to change the agreement in any way or to terminate the agreement. In the event of notice by either party to change and/or terminate, and no agreement of such changes and/or termination is reached prior to May 31, 2010 this Agreement shall be deemed to have terminated midnight, May 31, 2010.

Dated this 1st day of June, 2007.

For and on behalf of:

---

## IRON WORKERS LOCAL UNION NO. 25

John Hamric
William Burch, Jr.
Kevin McDonell
Dennis Aguirre II
Steve Gulick
Jeff Hamric
James Horvath II
Douglas C. Washburn

### GREAT LAKES FABRICATORS AND ERECTORS ASSOCIATION

D. James Walker, Jr.

### THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, MICHIGAN CHAPTER

Bart Carrigan

### MICHIGAN CONVEYOR MANUFACTURERS ASSOCIATION, INC.

Larry Yates

### MEMORANDUM OF UNDERSTANDING REGARDING FIRE WATCH

When an Employer is required to provide fire watch for the work of ironworkers, customarily an ironworker employee will be used to perform such fire watch. When a single employee is used to perform fire watch for the work of multiple trades, the Employer will have flexibility in assigning such fire watch to a single trade.

# 2007-2010
# AGREEMENT BETWEEN BRIDGE, STRUCTURAL, ORNAMENTAL & REINFORCING IRON WORKERS LOCAL NO. 25

The undersigned Employer, for itself, its successors, assigns, lessees and any entity it controls, owns or represents, agrees to adopt and be bound by all provisions of the 2007-2010 Agreement between Iron Workers Local No. 25 ("Union") and the Great Lakes Fabricators and Erectors Association, Michigan Chapter, the Associated General Contractors of America, and the Michigan Conveyor Manufacturers Association ("Association") for itself and the Michigan Conveyor Manufacturers Association ("Association"). This agreement to adopt and be bound by the 2007-2010 Agreement is not voidable. Notice by the Union to the Association pursuant to Article 38 of the 2007-2010 Agreement is notice to the Employer and has the same legal effect as though it was served on the Employer. Unless the Employer notifies the Union to the contrary, in writing, at least 90 days prior to the expiration date of the 2007-2010 Agreement (or any subsequent Agreement), the Employer adopts and is bound by all provisions of any subsequent Agreement between the Union and the Association following notice pursuant to Article 38.

## FOR THE COMPANY

Print Company Name

Signature of Officer

Date Signed

Company Address

City, State, Zip

Telephone _____ Fax No. _____

Workers' Compensation and Policy No. _____ Expiration Date

Name of Insurance Carrier

Unemployment Compensation No.

State License No. _____ Federal I.D. No.

E-mail Address

## FOR IRON WORKERS LOCAL NO. 25

Signed By: _____ Date: _____

38

# MEMORANDUM OF UNDERSTANDING

The parties to the 2007-2010 Iron Workers Structural Agreement agree that when a member is requested from the Union, the member must meet all of the requirements under this Agreement as communicated by the Employer to the Union or they will not be considered ready to work. If a member is not ready to work, they will not be paid until they meet the requirements necessary to work under the Agreement as communicated by the Employer.

Date: June 1, 2007

D. Jantos, Walker, Jr.

Date: June 1, 2007

Jim Hawnic

39

# IRON WORKERS' LOCAL UNION NO. 25
## CODE OF EXCELLENCE

### Preamble

Whereas, The purpose of the Iron Workers' Local Union No. 25 Code of Excellence is to reinforce the pride of every Ironworker and our commitment to be the the most skilled, most productive and safest craft in the Building Trades;

Whereas, As a Union Ironworkers, we pledge ourselves to be ready to work, to uphold our word as given through our collective bargaining agreement and display the professionalism expected of our trade and Union in all aspects of our employment as exemplified by the values engrained in our Code of Excellence;

Whereas, It is a commitment to use our training and skills, each and every day, to produce the highest quality work worthy of our name and consistent with the collective bargaining agreement; and

Whereas, This commitment will improve work place conditions, increase work opportunities, and help maintain our wages, benefits and standard of living; now, therefore be it

*Resolved*, That the membership of Iron Workers' Local Union No. 25 adopts and pledges its commitment to the 10 principles of the Iron Workers' Local Union No. 25 Code of Excellence as follows;

1. Adhere to the requirements under the collective bargaining agreement for start and quit times, as well as lunch and break times.

2. Allow my Union Representatives to handle any disagreements or contract violations rather than engage in unlawful job disruptions, slowdowns or other activities that affect Iron Workers' Local Union No. 25's good name and contractual commitments.

3. Respect the Customer's and Employer's rights, property and tools as I do my own.

4. Meet my responsibility to be ready for work and fit for duty every day, thereby ensuring that Iron Workers' Local Union No. 25's zero tolerance policy for substance abuse is strictly met.

5. Cooperate with the Customer and Employer to help ensure that the statutory, regulatory and contractual responsibilities are met to maintain a safe, healthy and sanitary workplace.

6. Perform high quality work using all of my skills, training and experience.

7. Do my best to help every co-worker return home safe at the conclusion of every shift.

8. Use and promote Iron Workers' Local Union No. 25's training and certification programs so that all of our members will have lifelong learning, thus ensuring Iron Workers' Local Union No. 25's members are the most highly trained and sought after workers.

9. Promise that Iron Workers' Local Union No. 25 and its Stewards will work with members to correct and solve problems related to job performance.

10. Ensure that Iron Workers' Local Union No. 25's Stewards shall receive specialized training in the Code of Excellence.

40

**BRIDGE, STRUCTURAL AND ORNAMENTAL IRON WORKERS, LOCAL NO. 25**
25150 Trans-X Drive
P.O. Box 965
Novi, Michigan 48376
Telephone: (248) 344-9494
Fax: (248) 344-4851
*James Mantz, Business Manager, FST*

**GREAT LAKES FABRICATORS AND ERECTORS ASSOCIATION**
1001 Woodward
Suite 1101
Detroit, Michigan 48226
Telephone: (313) 309-2000
Fax: (313) 309-2004
*D. James Walker, Executive Director*

**THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA, DETROIT CHAPTER**
26001 Five Mile Road
Redford, Michigan 48239
Telephone: (313) 533-3509
Fax: (313) 355-3574
*Bart Carrigan, President*

**MICHIGAN CONVEYOR MANUFACTURERS ASSOCIATION, INC.**
7771 Lochlin Road
Brighton, MI 48116
Telephone: (248) 446-0118
Fax: (248) 446-1550
*Larry Estes, President*